## UNITED STATES v. DAUPHIN DEPOSIT TRUST CO. et al.

### No. 1118.

District Court, Middle District of Pennsylvania.

May 18, 1943.

Francis M. Shea, Asst. Atty. Gen., and Frederick V. Follmer, U. S. Atty., and Joseph P. Brennan, Asst. U. S. Atty., both of Scranton, Pa. (Sidney J. Kaplan, Sp. Asst. to the Atty. Gen., and Martin Norr, Atty., Department of Justice, of Washington, D. C., of counsel), for plaintiff.

Alton W. Lick, of Harrisburg, Pa., for defendants.

JOHNSON, District Judge.

This is a civil action praying for a declaratory judgment brought by the United States of America against the Dauphin Deposit Trust Company, a corporation incorporated under the laws of the State of Pennsylvania with principal place of business at Harrisburg, Pennsylvania, individually and as executor under the last will and testament of William G. Garverich,

and also against Nellie G. Heck, defendants.

The question presented by the complaint is whether certain United States savings bonds became by virtue of their terms, and Federal Statutes and United States Treasury regulations, the property of the beneficiary named in the bonds or whether the said bonds became the property of the estate of the deceased registered owner.

From the evidence in the case the Court finds the following:

### I. Facts

1. William G. Garverich, in his lifetime a resident of Dauphin, Pennsylvania, was the purchaser of five United States Savings Bonds each of the maturity value of one thousand dollars ($1,000.00), and numbered M-282810G, M-282811G, M-282812G, M-282813G, and M-282814G. These bonds were issued as of the first day of January, 1942, and each was registered in the form "Mr. William G. Garverich, Dauphin Pennsylvania, Payable on death to Mrs. Nellie G. Heck". Each identical bond contains a citation of the Treasury Circular under which it was issued and refers thereto "for a statement of the rights of holders, as fully and with the same effect as though herein set forth". The circular so referred to is numbered 654. Each bond also provides on its face that it is payable only "in accordance with the provisions of said circular and the regulations prescribed from time to time thereunder."

2. William G. Garverich died on October 23, 1942, without having presented, and without having surrendered to a Federal Reserve Bank or the Treasury Department, any of the bonds for payment.

3. On November 24, 1942, the defendant qualified as Executor of the Estate of William G. Garverich, deceased.

4. The United States Savings Bonds above referred to were issued under, and their transfer and ownership are controlled by, Section 22 of the Second Liberty Bond Act, as added by the Act of February 4, 1935, 49 Stat. 21, as amended by the Public Debt Act of 1941, Act of February 19, 1941, 55 Stat. 7, Title 31 U.S.C.A. § 757c.

Section 22(a) of the Second Liberty Bond Act, as amended by Public Debt Act of 1941, reads in part as follows: "The Secretary of the Treasury, with the approval of the President, is authorized to issue, from time to time, through the Postal Service or otherwise, United States savings bonds and United States Treasury savings certificates, the proceeds of which shall be available to meet any public expenditures authorized by law, and to retire any outstanding obligations of the United States bearing interest or issued on a discount basis. The various issues and series of the savings bonds and the savings certificates shall be in such forms, shall be offered in such amounts subject to the limitation imposed by section 757b of this title, and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b), (c), and (d) hereof, and including any restrictions on their transfer, as the Secretary of the Treasury may from time to time prescribe."

5. Pursuant to this authority the Secretary of the Treasury, with the approval of the President, has issued United States Savings Bonds in series designated by a letter and by the calendar year of issue, each lettered series being offered by a formal circular of the Treasury Department. The bonds involved in this case and described herein are bonds of Series G-1942. The offering circular under which said Series G-1942 was issued was Treasury Department Circular No. 654, dated April 15, 1941 (6 Federal Register 6434). Said Circular No. 654 provided in part as follows:

"Par. II, 6. The bonds will not be transferable, and will be payable only to the owner named thereon, except in case of death or disability of the owner or as otherwise specifically provided in the regulations governing savings bonds, and in any event only in accordance with such regulations. Accordingly they may not be sold, and may not be hypothecated as collateral for a loan.

"Par. IX, 1. All savings bonds of Series F and Series G, issued pursuant to this circular, shall be subject to the regulations prescribed from time to time by the Secretary of the Treasury to govern United States Savings Bonds. The present regulations governing savings bonds are set forth in Treasury Department Circular No. 530, Fourth Revision, dated April 15, 1941, copies of which may be obtained on application to the Treasury Department, or to any Federal Reserve Bank."

6. The regulations in force at the time of the purchase of the Series G-1942 bonds here involved were contained in Treasury Department Circular No. 530, Fourth Revi-

sion, dated April 15, 1941 (6 Federal Register 2191), amended June 26, 1941 (6 Federal Register 3175), and subsequently amended on April 20, 1942 (7 Federal Register 2992). The regulations in force at the time of the death of William G. Garverich on October 23, 1942, and in force at the present time, are contained in Treasury Department Circular No. 530, Fifth Revision, dated June 1, 1942 (7 Federal Register 5158), amended November 23, 1942 (7 Federal Register 9772). In the respects here material the foregoing regulations are sub·stantially identical.

7. Treasury Regulations, Department Circular 530, Fifth Revision (7 F.R. 5158), in § 315.4, provides three methods of registration: (Series G bonds are included by § 315.5)

1. One Person.

2. Two Persons; coownership form.

3. Two Persons; beneficiary form.

8. Subpart K provides for payment or for re-issue in registrations under the names of two persons in coownership form as follows:

§ 315.32

a. "During the lives of both coowners the bond will be paid to either coowner upon his separate request without requiring the signature of the other coowner; * * *"

b. "If either coowner dies without having presented and surrendered the bond for payment * * * the surviving co-owner will be recognized as the sole and absolute owner of the bond, and payment will be made only to him: * * *".

9. Subpart L provides for payment or re-issue in registrations under the names of two persons in beneficiary form, as follows:

§ 315.34

"A bond registered in the name of one person payable on death to another, * * *, will be paid to the registered owner during his lifetime upon his properly executed request as though no beneficiary had been named in the registration".

10. The record does not show that Mrs. Heck, the beneficiary in the instant case, had knowledge of the transaction and it is apparent that there was no delivery of the bonds to her as they remained in the possession of the registered owner until the time of his death.

11. Both defendant Dauphin Deposit Trust Company and defendant Nellie G. Heck were duly served with the summons and complaint. No answer has been filed or appearance noted by Mrs. Heck.

12. Defendant Dauphin Deposit Trust Company has filed an "Answer and Claim". The answer admits all the facts averred in the Government's complaint although it asserts contentions of law by way of defense. The answer counterclaims for the redemption price of the bonds on the contention that the succession laws of the State of Pennsylvania were embodied in the contract of the parties and that the said laws provide that the bonds are part of the decedent's estate.

From the foregoing findings of fact the Court arrives at the following:

## II. Conclusions of Law

1. Under the law of the Commonwealth of Pennsylvania, the bonds in controversy constitute a contract between the United States of America and William G. Garverich, wherein Nellie G. Heck is the donee beneficiary. Commonwealth v. Great American Indemnity Co., Appellant, 312 Pa. 183, 167 A. 793; Restatement of the Law of Contracts, §§ 133, 135, 345. The rights of the beneficiary, Nellie G. Heck, arise solely from this contract and not from sale, devise or gift.

2. Congress is given the power under the Constitution in Article 1, Section 8; clause 2, "To borrow Money on the credit of the United States". Issuance of the involved Savings Bonds under the Second Liberty Bond Act is an exercise of this power.

3. Article 6, clause 2, provides "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

4. Because the Federal Government is a party to the contract this is a Federal contract which is necessarily controlled by the Federal law. It is based upon the exercise of the power delegated to Congress to borrow money on the credit of the United States. Erie R. Co. v. Tomp-

kins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not apply. The borrowing power necessarily includes the power to fix the terms of the Government's obligations. Legal Tender Case, 110 U.S. 421, 48 S.Ct. 122, 28 L.Ed. 204. The Treasury regulations are within the authority given the Secretary of the Treasury by the Congress and have the force of Federal law. United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L. Ed. 930; United States v. Janowitz, 257 U. S. 42, 42 S.Ct. 40, 66 L.Ed. 120.

■ 5. Rules and regulations prescribed by administrative bodies and officers and which are adopted pursuant to authority of an act of Congress, so long as they are reasonably adapted to the enforcement of the act, and are not in conflict with express statutory provisions, have the force and effect of law. Maryland Casualty Co. v. United States, 251 U.S. 342, at page 349, 40 S.Ct. 155, 64 L.Ed. 297.

■ 6. Each of said bonds, together with the Statutes, Treasury Regulations, and Circulars constitute a valid and binding contract determining the rights of the parties therein and that ownership and title to the said bonds are controlled by Section 22 of the Second Liberty Bond Act, as amended, and the aforesaid Treasury Regulations and Circulars.

### III. Discussion

Defendant contends that under the laws of the Commonwealth of Pennsylvania it is legally bound to administer well and truly the goods and chattels, rights and credits possessed by William G. Garverich in his lifetime; that his attempted disposition of the bonds to Mrs. Nellie G. Heck was testamentary in character; that the laws of succession of the Commonwealth of Pennsylvania were in force and effect prior to the purchase of the bonds; that the contract between the United States and William G. Garverich was entered into subject to the operation of the said succession laws and that defendant is entitled to the redemption value of the bonds for the purpose of administration. Under this contention the defendant executor presented the bonds for payment and payment was refused.

The Government filed a reply to the Claim, denying the jurisdiction of the Court over the counterclaim. Inasmuch as the counterclaim comprises the same questions of fact and law, this court will consider the whole controversy on the basis of the complaint.

Counsel for the Government maintain that this is a question of national importance, the decision of which will affect the sale of such bonds and the borrowing of money by the United States on favorable terms. It would necessarily follow that conduct of a global war, requiring the expenditure of extraordinarily large sums of money, might meet with serious reverses if any conflict of authority should adversely affect the ability of the Federal Government to control all phases of financing that war.

It is the contention of counsel for the Government that the regulations promulgated by the Secretary of the Treasury in connection with the Second Liberty Bond Act to have the force and effect of law; that the Regulations must be read into the contract between the United States and William G. Garverich so as to become a part thereof; that the laws applicable thereto and which govern the contract and the enforcement thereof are not the laws of the Commonwealth of Pennsylvania, but the Federal laws, which preempt the field of applicable law and preclude the exercise of concurrent authority. Under this contention the Government claims that Nellie G. Heck is the sole and absolute owner of the bonds and the proceeds thereof.

Chief Justice Marshall, in the case of McCulloch v. Maryland, 4 Wheat. 316, at page 405, 4 L.Ed. 579, March 7, 1819, stated "This government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, so long as our system shall exist. In discussing these questions, the conflicting powers of the general and State governments must be brought into view, and the supremacy of their respective laws, when they are in opposition, must be settled.

"If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its

powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it, by saying, 'this constitution, and the laws of the United States, which shall be made in pursuance thereof,' 'shall be the supreme law of the land,' and by requiring that the members of the State legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it. The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any State to the contrary notwithstanding.' "

It is stated in Irvine v. Marshall et al., 20 How. 558 at page 563, 15 L.Ed. 994: "Another error, * * * is seen in the supposition that the contracts of the Government with respect to subjects within its constitutional competency are also local, confined in their effect and operation strictly to the situs of the subjects to which they relate. The true principle applicable to the objection just noted, and by which that objection is at once obviated, we hold to be this: That within the provisions prescribed by the Constitution, and by the laws enacted in accordance with the Constitution, the acts and powers of the Government are to be interpreted and applied so as to create and maintain a system, general, equal, and beneficial as a whole."

To quote again from Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, at pages 406 and 436, 4 L.Ed. 579, "among the enumerated powers of government, * * * we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government. It can never be pretended that these vast powers draw after them others of inferior importance, merely because they are inferior.

Such an idea can never be advanced. But it may with great reason be contended, that a government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution, by withholding the most appropriate means. Throughout this vast republic, from the St. Croix to the Gulf of Mexico, from the Atlantic to the Pacific, revenue is to be collected and expended, armies are to be marched and supported. The exigencies of the nation may require that the treasure raised in the north should be transported to the south, that raised in the east, conveyed to the west, or that this order should be reversed. Is that construction of the constitution to be preferred which would render these operations difficult, hazardous, and expensive? Can we adopt that construction (unless the words imperiously require it), which would impute to the framers of that instrument, when granting these powers for the public good, the intention of impeding their exercise by withholding a choice of means?"

" * * * the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared."

These savings bonds are issued and sold throughout the United States. Application to the issue and sale of these securities of state law would lead to a great diversity of rules regulating title and redemption and would subject the entire financing plan of the Federal Government to exceptional uncertainty by making identical transactions subject to the vagaries of the several states. This constitutes another example in the constantly increasing list of cases where application of the doctrine of Erie R. Co. v. Tompkins, supra, will lead to more confusion in the Federal law.

From the foregoing findings of facts, conclusions of law, and discussion, the Court enters the following:

## IV. Decree

And Now, this 18th day of May, 1943, it is ordered and decreed that the defendant Nellie G. Heck is the sole and absolute owner of aforesaid bonds numbered M-282810G, M-282811G, M-282812G, M-282813G, and M-282814G, and is entitled to immediate possession thereof and to payment of the principal thereof upon appropriate request or at maturity, as well as to collect payment of interest thereon until surrender thereof.